CR# 05-1631-CBS

## AFFIDAVIT OF SPECIAL AGENT MATTHEW DEIGNAN

Special Agent Matthew M. Deignan deposes and states as follows:

### I. INTRODUCTION

1. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I have served in this capacity for over fourteen years and am currently assigned to the Boston, Massachusetts Divisional Office. During my tenure as a Special Agent, I have worked on dozens of drug investigations. I have conducted surveillance of controlled purchases of narcotics by agents acting in an undercover capacity and confidential informants on numerous occasions and I, acting in an undercover capacity, have also participated in controlled purchases of narcotics. I have written and/or participated in the execution of numerous search warrants resulting in seizures, including large quantities of controlled substances: large amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances. The information contained in this affidavit was either observed by me or related to me by other law enforcement officers involved in this investigation.

2.   I am submitting this affidavit in support of  1) an application for a criminal complaint charging Rafael GONZALEZ-VINCENTE a/k/a WILLY, a/k/a Raphael GONZALEZ JR. and Jose A. RAMOS a/k/a JONATHAN (hereinafter referred to as "the Target Subjects") with conspiracy to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§846, 841(a)(1); and 2) an application for the issuance of a search warrant to be executed at 14 Cherry Street, Apt. 1, Salem, Massachusetts as described more fully below and as further described in **Attachment A** attached hereto and incorporated herein ("Target Location").

3.   This affidavit includes a summary of events that I am personally familiar with as well as the observations and knowledge related to me by other DEA agents, officers of Salem Police Department, Massachusetts State Troopers, and other law enforcement personnel who have been working on this investigation.  This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects have committed the aforementioned crimes described within the attached Criminal Complaint, and that the Target Location contains evidence of the commission of the aforementioned criminal

2

offense, contraband, the fruits of the aforementioned criminal offense, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing the aforementioned criminal offense as described more fully in **Attachments B** attached hereto and incorporated herein.

## II.  TARGET SUBJECTS

### A.  RAFAEL GONZALEZ-VINCENTE a/k/a Willy, a/k/a Raphael Gonzalez, Jr.

4.    Through the combined use of controlled purchases by a confidential source ("CS"), DEA Special Agent Paul Gazzara acting in an undercover capacity ("UC"), pen register data, surveillance, and a traffic stop on June 10, 2004, by the Peabody, MA Police, I have identified "WILLY", the supplier of cocaine and cocaine base to the CS and UC, as Rafael GONZALEZ-VINCENTE a/k/a Raphael GONZALEZ JR.  A check of Massachusetts Registry of Motor Vehicles records and law enforcement databases show an address of 3 Mason Street, Apt. #3, Salem, Massachusetts and a date of birth of December 20, 1971 and Social Security number 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 for GONZALEZ-VINCENTE.  GONZALEZ-VINCENTE has an arrest for possession to distribute cocaine by the Lynn, MA Police Department on August 31, 2000 that was dismissed.  As discussed in more detail below, GONZALEZ-VINCENTE distributes

cocaine and cocaine base to customers in the Beverly, Peabody and Salem, MA area. Based upon the investigation to date, GONZALEZ-VINCENTE lives at the Target Location.

### B. JOSE A. RAMOS a/k/a JONATHAN

5. Based on evidence obtained through surveillance and by undercover meetings with the CS and the UC and previous investigations by the Peabody, MA Police Department, I have identified the male known to the CS as JONATHAN LNU and who has accompanied GONZALEZ-VINCENTE on several meetings with the CS at which drug transactions were discussed and who has also delivered crack cocaine to both the CS and the UC, as described in more detail below, as Jose A. RAMOS (DOB: 12-07-1980). A query with the Massachusetts RMV showed that RAMOS has a Massachusetts License number S54088153 and Social Security number 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 and a mailing address of 14 Cherry Street Apt. 1, Salem, MA 01970, the Target Location. On or about September 19, 2004, RAMOS was arrested with Edward VINCENTE, believed to be GONZALEZ-VINCENTE's brother, and they were charged with possession of Class B controlled substance (cocaine) with intent to distribute and conspiracy to violate the Controlled Substances Act in Peabody District Court. This charge is still pending.

4

## III. TARGET LOCATION

### A.  14 Cherry Street, Apt. 1 Salem, MA

6. Through surveillance, and information provided by the CS, agents have identified 14 Cherry Street, Apt. 1, Salem, MA as described herein and in **Attachment A** (again, the "Target Location") as the residence of GONZALEZ-VINCENTE. According to Massachusetts Electric, the subscriber to electricity for 14 Cherry St., Apt. 1, Salem, MA is Alfredo SANTO who provided Massachusetts Electric with a contact telephone number of (978) 223-5333. This is a T-Mobile prepay telephone number used by GONZALEZ-VINCENTE during certain calls with the CS and UC. As described in more detail below, GONZALEZ-VINCENTE conducted a sale of cocaine base with the CS at the Target Location on September 2, 2003. More recently, on November 17, 2004, GONZALEZ-VINCENTE and a female were observed by surveillance agents leaving the Target Location and then arriving at a meeting with the UC to sell 24.9 grams of cocaine base to him. Based upon the investigation, GONZALEZ-VINCENTE resides at the Target Location. RAMOS also lists the Target Location as his mailing address and has been observed at this location including, most recently, on January 17, 2005.[1] Surveillance agents have

---

[1] I drove by the Target Location on the morning of January 17, 2005. At this time, I observed RAMOS exiting the front door of the Target Location.

followed GONZALEZ-VINCENTE to this location and have also observed, as described in more detail below, a vehicle that GONZALEZ-VINCENTE and his runners, have utilized to distribute crack cocaine and cocaine to the CS and the UC parked at the Target Location on several occasions.

IV. **PROBABLE CAUSE FOR COMPLAINT AGAINST GONZALEZ-VINCENTE AND RAMOS**

   A. **GONZALEZ-VINCENTE (AND HIS RUNNERS INCLUDING RAMOS) SELL COCAINE BASE TO THE CS**

   7.   Since August 2003, the CS[2] began negotiations with GONZALEZ-VINCENTE for the purpose of making purchases of cocaine base ostensibly as samples to test the quality of GONZALEZ-VINCENTE's supply.  The CS had told GONZALEZ-VINCENTE that it had a market for the crack cocaine in Greece where the profit margin was much higher.

   8.   On September 1, 2003, the CS placed an unrecorded telephone call to GONZALEZ-VINCENTE at telephone number (978) 223-5333.  At this time the CS arranged to purchase one ounce of cocaine base from GONZALEZ-VINCENTE the following day, September 2, 2003.

---

[2]I note that the CS has been an informant working with DEA at various times since 1992. During that time, it has been compensated by DEA including for its involvement in this investigation.  CS, a former drug user, knew GONZALEZ-VINCENTE because it had previously purchased cocaine in personal use quantities from him on two to three occasions in the early 1990s.

9.   On September 2, 2003, the CS, in my presence, placed an unrecorded telephone call to GONZALEZ-VINCENTE at the same number and arranged to meet at Big Fred's Roast Beef Restaurant at 17 Canal Street in Salem, MA.   The CS was then searched and provided with $1,200.00 in serialized funds and a concealed transmitter.

10.   The CS was then followed to Big Fred's Roast Beef Restaurant in Salem, MA.   After the CS had been waiting for approximately thirty minutes in the parking lot, surveillance agents observed a Hispanic male, later identified as GONZALEZ-VINCENTE, meet with the CS and then enter the CS's vehicle. The CS was then directed by GONZALEZ-VINCENTE to drive to Cherry Street in Salem and pull into the driveway on the left side of the Target Location.   The route that GONZALEZ-VINCENTE had the CS take to Cherry Street was a very circuitous one and during the ride GONZALEZ-VINCENTE observed one of the surveillance vehicles and asked the CS if the CS knew whose car it was.

11.   During the ride, the CS asked GONZALEZ-VICENTE if the Target Location was his house and GONZALEZ-VICENTE told it that it was his house.   The CS said that it entered the right rear of the house with GONZALEZ-VINCENTE and entered the first floor apartment (the Target Location).   There was a Hispanic woman

7

along with some young children there.  The CS said that it followed GONZALEZ-VINCENTE into a bedroom that at the time had the windows covered with dark plastic. At this time, GONZALEZ-VINCENTE removed a plastic bag with crack cocaine in it from his pocket and gave it to the CS.  The CS then gave GONZALEZ-VINCENTE the $1,200.00.

12.  Approximately ten minutes later, surveillance agents observed the CS and GONZALEZ-VINCENTE walk from the rear of the building to the CS's vehicle and converse for a few minutes. The surveillance agents observed the CS enter its vehicle and GONZALEZ-VINCENTE walk toward the back of the building.  The CS was then followed to a prearranged meet location where it turned over the cocaine base to me.  This meeting was recorded and monitored.

13.  Analysis by the DEA Northeast Regional Laboratory determined that the substance that GONZALEZ-VINCENTE had sold on September 2, 2003 consisted of 26.2 grams of cocaine base.

14.  On September 16, 2003, the CS arranged to meet GONZALEZ-VINCENTE at Big Fred's Roast Beef on Canal Street in Salem, MA to purchase four and one half ounces of crack cocaine for $4,500.00.  The CS was provided with $4,500.00 in serialized funds.  The CS was followed to Big Fred's Roast Beef.  After waiting at that location for approximately forty-

five minutes, the CS placed a call to GONZALEZ-VINCENTE at which time GONZALEZ-VINCENTE told the CS to meet it at the North Shore Mall in Peabody, MA.

15. The CS was then followed to the North Shore Mall and, following another series of phone calls, met with GONZALEZ-VINCENTE in front of the entrance to the mall food court.

16. Surveillance agents observed the CS drive up to the entrance of the food court and GONZALEZ-VINCENTE enter the passenger side of the CS's vehicle. GONZALEZ-VINCENTE then directed the CS to give him a ride and directed the CS to drive to Route 114 toward Peabody. The CS later informed me that GONZALEZ-VINCENTE removed a plastic bag containing crack cocaine which was wrapped in a ball of tin foil from his right pants pocket. The CS had GONZALEZ-VINCENTE place the crack in a box in the back seat of the CS's vehicle. Surveillance agents observed GONZALEZ-VINCENTE reaching into the back seat of the CS's vehicle. The CS then gave GONZALEZ-VINCENTE the $4,500.00. The CS then dropped GONZALEZ-VINCENTE off on Spring Street in Peabody, MA. This meeting was recorded and monitored.

17. Following the meeting the CS was followed to a prearranged meet location where it turned over the cocaine base to me and another agent.

9

18.    Analysis by the DEA Northeast Regional Laboratory determined that the substance that GONZALEZ-VINCENTE had sold to the CS on September 16, 2003 consisted of 121 grams of cocaine base.

19.    On or about September 30, 2003, the CS contacted GONZALEZ-VINCENTE by telephone to arrange a meeting. The two agreed to meet the next day.

20.    The following day, October 1, 2003, the CS attempted to contact GONZALEZ-VINCENTE by telephone again, but was unable to reach him at the telephone. After several unsuccessful attempts to reach GONZALEZ-VINCENTE by phone, the CS went to the Target Location in an attempt to speak to GONZALEZ-VINCENTE. The CS went to the right rear door of the Target Location and knocked on the door, but received no response. The CS and GONZALEZ-VINCENTE spoke again by telephone on October 6 or 7, 2003 and agreed to meet on October 8th to negotiate the CS's purchase of one kilogram of cocaine base from GONZALEZ-VINCENTE.

21.    They eventually met on October 8th at the Rinconcriollo Madrid Spain on Union Street in Lynn. During this meeting, that was recorded and monitored, they discussed arrangements for the CS to purchase a kilogram of cocaine base from GONZALEZ-VINCENTE. The CS, GONZALEZ-VINCENTE and RAMOS

10

subsequently met on November 10, 2003 at Hilltop Restaurant in Saugus, Massachusetts. This meeting was also monitored and recorded and the CS and GONZALEZ-VINCENTE discussed GONZALEZ-VINCENTE selling a kilogram of cocaine base to the CS. This deal, however, was never consummated as GONZALEZ-VINCENTE left the United States for the Dominican Republic on or about November 13, 2003.

22. On February 10 and 11, 2004, the CS placed recorded telephone calls to GONZALEZ-VINCENTE at (978) 223-5333. In these calls, the CS arranged to purchase one ounce of cocaine base for $1,500.00 from GONZALEZ-VINCENTE on February 12, 2004 at the North Shore Mall in Peabody, MA.

23. On February 12, 2004 the CS placed a consensually recorded telephone call to GONZALEZ-VINCENTE and arranged to meet with him at the North Shore Mall in Peabody, MA. The CS and its vehicle were then searched and the CS was provided with $2,000.00 in serialized funds for the purchase of one ounce of crack cocaine and the possible purchase of a sample of heroin. (In a prior meeting, GONZALEZ-VINCENTE had mentioned to the CS that he had heroin available for purchase).

24. The CS was then followed to the North Shore Mall at which time the CS was followed into the food court of the mall.

11

25.    After waiting approximately forty-five minutes, surveillance agents observed the CS meet with GONZALEZ-VINCENTE and RAMOS.    After they had met for several minutes, agents observed the CS and RAMOS walk away from the food court area while GONZALEZ-VINCENTE remained in the food court using his cellular phone.    During later debriefing, the CS informed me that GONZALEZ-VINCENTE instructed him to put the money ($1,500.00) for the narcotics in his jacket and then directed the CS to go out into the parking lot with RAMOS.    Once in the parking lot, the CS and RAMOS entered a gray Toyota Camry (MA registration 98SN39, registered to Altagracia MORETA at 3 Mason Street Salem, MA) ("gray Camry") and RAMOS reached into the console and handed a white wafer-like substance contained inside two plastic bags and wrapped in paper towels to the CS.

26.    A few minutes later, surveillance observed the CS placing something in its trunk and observed RAMOS sitting in the gray Camry in the row next to the CS's vehicle.    A few minutes later, the CS advised me by telephone that it had the cocaine base and that RAMOS had given it to the CS.    This meeting was monitored and recorded, however, due to a technical malfunction only part of the meeting was recorded.

27.    After the meeting, the CS was followed to the prearranged meet location.    At this time the CS opened its

12

trunk and turned over the package that it had received from RAMOS. The CS also turned over the remaining $500.00 in serialized funds to me.

28.   Analysis by the DEA Northeast Regional Laboratory determined that the substance that GONZALEZ-VINCENTE and RAMOS had sold on February 12, 2004 consisted of 26.8 grams of cocaine base.

29.   On August 12, 2004, the CS had arranged to meet with GONZALEZ-VINCENTE at the Bugaboo Creek Restaurant at the North Shore Mall to purchase one ounce of crack cocaine for $1,500.00. Prior to the purchase the CS met with surveillance agents at a prearranged meet location and the CS and its vehicle were searched for excess monies and contraband with negative results. The CS was then provided with a concealed transmitter and $1,500.00 in serialized funds.

30.   The CS was then followed to the Bugaboo Creek Restaurant. While the CS waited in the parking lot, it placed two telephone calls to GONZALEZ-VINCENTE inquiring about his whereabouts. The CS contacted me telephonically to advise that GONZALEZ-VINCENTE was on his way to the meeting. After approximately thirty minutes, surveillance agents observed the gray Camry (the same vehicle that had been used in previous transaction) arrive in the parking lot of the restaurant

operated by a Hispanic male.  At this time, the CS received a
telephone call from GONZALEZ-VINCENTE who told the CS to look
for his car in the parking lot.

31.  The CS walked over to the gray Camry and met with the
Hispanic male who asked if the CS was "MALAKA" (a nickname
referring to the CS used by the CS and GONZALEZ-VINCENTE).  The
male then stated his name was "ROBERTO."  The CS entered the
passenger side of the gray Camry and ROBERTO circled the
parking lot.  At this time, the CS gave ROBERTO the $1,500.00
in serialized funds and ROBERTO gave the CS a plastic bag with
a white wafer-like substance in it.  During the transaction
with ROBERTO, the CS spoke with GONZALEZ-VINCENTE on its
cellular telephone.  After the transaction, ROBERTO dropped the
CS at its vehicle and then drove from the parking lot.  The
meeting was monitored, recorded and videotaped.

32.  The CS was then followed to the prearranged meet
location where it turned over the plastic bag containing the
white substance to me and another agent.  The CS and its
vehicle were then searched for contraband and excess monies
with negative results.

33.  Analysis by the DEA Northeast Regional Laboratory
determined that the substance that ROBERTO LNU had sold on
August 12, 2004 consisted of 25.8 grams of cocaine base.

**B.   THE UC MEETS GONZALEZ-VINCENTE AND BEGINS TO BUY
       COCAINE BASE FROM HIM**

34.   On September 22, 2004 the CS had arranged to meet
GONZALEZ-VINCENTE at the Bugaboo Creek Restaurant at the North
Shore Mall to purchase two ounces of crack cocaine and to
introduce DEA Special Agent Paul Gazzara, acting in an
undercover capacity ("UC") to GONZALEZ-VINCENTE as a customer.

35.   Prior to the meeting, the CS and its vehicle were
searched for contraband and excess monies with negative
results. The CS was given a concealed transmitter and the UC
was given $3,000.00 in serialized funds.  The CS then placed a
consensually recorded telephone call to GONZALEZ-VINCENTE and
confirmed that GONZALEZ-VINCENTE would be at the restaurant.
GONZALEZ-VINCENTE told the CS to leave the money for the
cocaine base in the CS's vehicle and that GONZALEZ-VINCENTE
would take the money and leave the cocaine base in the car.

36.   The CS and the UC, traveling in the CS's vehicle,
were followed by surveillance agents to the Bugaboo Creek
Restaurant.  The CS parked its vehicle and the CS and the UC
waited in front of the restaurant.  A short time later,
surveillance observed the gray Camry (the same one that had
been used in the previous two transactions to deliver cocaine

base to the CS on behalf of GONZALEZ-VINCENTE) arrive in the parking lot driven by a different Hispanic male.

37. Surveillance observed the driver, a heavy set male, exit the gray Camry, walk to the CS's vehicle, get into the driver's door of the CS's vehicle and then get out of the car. At this time, the CS took the $3,000.00 from the UC and walked over to the male who identified himself as "TITO." The CS gave TITO the $3,000.00 in serialized funds and TITO placed a plastic bag with a white substance inside the driver's side of the CS' car. TITO told the CS that GONZALEZ-VINCENTE was on his way to the restaurant. Surveillance then observed TITO enter the gray Camry and drive from the mall lot. Surveillance attempted to follow the vehicle, but lost sight of the gray Camry in traffic shortly thereafter.

38. Moments after TITO left, the CS received a telephone call from GONZALEZ-VINCENTE. GONZALEZ-VINCENTE told the CS he had given the CS a gift with the cocaine base (meaning that he had given a separate, small quantity of cocaine to the CS along with cocaine base that it had purchased). The CS told GONZALEZ-VINCENTE that it had someone that it wanted to introduce to him and GONZALEZ-VINCENTE had the CS put the UC on the phone. GONZALEZ-VINCENTE told the UC that his name was "WILLY" and apologized for not being able to meet then but told

16

the UC to get his telephone number from the CS and to call him directly in the future.

39.    The CS and the UC then were followed to the prearranged meet location where the CS gave the plastic bag containing a white substance and a smaller bag containing a white powder to the UC.

40.    Analysis by the DEA Northeast Regional Laboratory determined that the substance that TITO had delivered to the CS on September 22, 2004 consisted of 47.1 grams of cocaine base. The lab also determined the white powder in the smaller bag consisted of 1.1 grams of cocaine hydrochloride.

41.    On October 26, 2004, the UC placed a consensually recorded telephone call to GONZALEZ-VINCENTE at telephone number (978) 239-5039.    At this time, the UC arranged to purchase one ounce of crack cocaine from GONZALEZ-VINCENTE on October 28, 2004 at the Bugaboo Creek Restaurant at the North Shore Mall.

42.    On October 28, 2004 surveillance was established on the Target Location.    That morning, surveillance observed the gray Camry (that had been previously used by RAMOS, ROBERTO and

17

TITO to deliver drugs to the CS for GONZALEZ) parked behind the Target Location.[3]

43.    That morning, the UC spoke with GONZALEZ-VINCENTE twice and confirmed that GONZALEZ-VINCENTE would be delivering one ounce of crack cocaine to him for $1,500.00 that afternoon. GONZALEZ-VINCENTE asked the UC what type of car he had and what the license plate number was on the car.

44.    The UC was given $1,500.00 in serialized funds and a concealed transmitter.  At approximately 12:30 p.m., the UC was followed by surveillance agents to the Bugaboo Creek Restaurant where he parked his car in the lot and waited.    At approximately 12:45 p.m., surveillance was discontinued at the Target Location (while the gray Camry was still parked at this location) and the surveillance agents drove toward the North Shore Mall to assist with surveillance at that location.

45.    At approximately 1:05 p.m., the UC exited his car and waited on the front porch of the restaurant.  At approximately 1:10 p.m., surveillance observed the gray Camry (the same vehicle that surveillance had observed at the Target Location earlier in the day), occupied by two males, enter the parking

---

[3]Surveillance had also observed the gray Camry at this location on the previous day, October 27, 2004.

lot at the rear of the Bugaboo Creek, and proceed to the front
of the parking lot.

46.   At this time, the UC observed the gray Camry drive
through the parking lot and stop at the base of the stairs.
The UC observed the driver of the car to be GONZALEZ-VINCENTE
and the passenger to be RAMOS.  At this time, GONZALEZ-VINCENTE
motioned for the UC to come to the gray Camry.   GONZALEZ-
VINCENTE then told the UC to get into the car and the UC then
entered the back seat of the gray Camry.

47.   Once inside the gray Camry, GONZALEZ-VINCENTE began
driving toward the rear of the restaurant.   GONZALEZ-VINCENTE
asked the UC for the money and the UC handed GONZALEZ-VINCENTE
a white envelope containing the $1,500.00 in serialized funds.
GONZALEZ-VINCENTE asked the UC if he was a policeman and the UC
said he was not.  GONZALEZ-VINCENTE then motioned to RAMOS who
removed a plastic bag containing a white substance from his
pocket.  RAMOS then handed the plastic bag to GONZALEZ-VINCENTE
who in turn handed the bag to the UC.  GONZALEZ-VINCENTE then
stopped the car in the parking lot at the rear of the
restaurant and the UC got out of the car.   GONZALEZ-VINCENTE
and RAMOS then drove from the parking lot.   This meeting was
consensually recorded and monitored.

19

48.   Surveillance agents followed the gray Camry onto Mason Street in Peabody, MA but lost sight of the vehicle in traffic.

49.   Analysis by the DEA Northeast Regional Laboratory determined that the substance that GONZALEZ-VINCENTE and RAMOS had sold on October 28, 2004 consisted of 26.9 grams of cocaine base.

50.   On the morning of November 17, 2004 surveillance was established at the Target Location.   The UC had previously arranged to meet with GONZALEZ-VINCENTE at the Bugaboo Creek restaurant at the North Shore Mall in Peabody, MA to purchase one ounce of crack cocaine for $1,500.00 that afternoon.

51.   At approximately 12:00 p.m., surveillance agents observed a male with a white shirt (later identified as GONZALEZ-VINCENTE) and a female exit the right rear door of the Target Location, walk to a car, enter the car and then drive from the area.

52.   Approximately twenty minutes later, surveillance agents observed the same vehicle (Massachusetts registration 44MP38, brown Buick Lesabre) park in the rear parking lot of the Bugaboo Creek restaurant.   Surveillance agents then observed the same Hispanic male wearing a white shirt (later identified as GONZALEZ-VINCENTE) and a female wearing an orange

20

shirt and white cap exit the Buick and walk through the back parking lot.

53.   At about this time the UC received a telephone call from GONZALEZ-VINCENTE who told the UC that he was at the restaurant.   The UC was then followed by surveillance agents to the restaurant a few minutes later.

54.   Upon entering the parking lot the UC observed GONZALEZ-VINCENTE (who was wearing a white shirt) and the female wearing an orange shirt walking in the parking lot. GONZALEZ-VINCENTE directed the UC to park next to the Buick. The UC exited his car and met with GONZALEZ-VINCENTE and the female who introduced herself as "Tiffany."   GONZALEZ-VINCENTE and TIFFANY got into the Buick.   The UC observed GONZALEZ-VINCENTE reach into the ashtray and remove a plastic bag containing an off-white substance.   The UC gave GONZALEZ-VINCENTE a coffee cup containing the $1,500.00 in serialized funds.   GONZALEZ-VINCENTE in return gave the UC the plastic bag and then handed the money to Tiffany whom the UC then observed count the money.   The UC and GONZALEZ-VINCENTE haggled over the price as GONZALEZ-VINCENTE wanted $1,600.00 instead of the $1,500.00.   GONZALEZ-VINCENTE then told the UC that he could supply the UC with heroin for one hundred and fifty dollars per gram.   After a few more minutes, the UC got into his car and

21

left and GONZALEZ-VINCENTE and Tiffany departed the parking lot. This meeting was monitored and recorded.

55. Surveillance agents followed GONZALEZ-VINCENTE to Beverly, MA where GONZALEZ-VINCENTE and Tiffany were observed meeting with a female in a white pickup truck. After having met with this female for approximately fifteen minutes, GONZALEZ-VINCENTE and Tiffany were followed back to the Target Location where the Buick was observed to enter the driveway and park at the rear of the house. Surveillance agents observed GONZALEZ-VINCENTE and Tiffany exit the Buick and walk into the right side rear door of the Target Location.

56. Analysis by the DEA Northeast Regional Laboratory determined that the substance that GONZALEZ-VINCENTE had sold to the UC on November 17, 2004 consisted of 24.9 grams of cocaine base.

**C. GONZALEZ-VINCENTE ARRANGES TO SELL A KILOGRAM OF COCAINE BASE TO THE CS**

57. On December 21, 2004, the CS met with GONZALEZ-VINCENTE and Tiffany at the Bugaboo Creek restaurant at the North Shore Mall in Peabody, MA. During this meeting, the CS told GONZALEZ-VINCENTE that its people were ready to buy a kilogram of cocaine base and that after the initial purchase and shipment, they would be looking to buy a minimum of two

22

kilograms of cocaine base per month. GONZALEZ-VINCENTE said that he could supply that. The CS asked him how much notice he would need and GONZALEZ-VINCENTE told it to call him the week before. GONZALEZ-VINCENTE told the CS that the price would be $45,000. During this meeting, the CS asked GONZALEZ-VINCENTE about his associates, ROBERTO and JONATHAN (a/k/a RAMOS). GONZALEZ-VINCENTE told it that ROBERTO had gotten a job at UPS and wasn't working with him anymore and was getting high every day. As to JONATHAN (a/k/a RAMOS), GONZALEZ-VINCENTE said that he was only working with Jonathan and GONZALEZ-VINCENTE's brother, Tony. Also during the course of this meeting, GONZALEZ-VINCENTE told the CS that he had a guy in New York who was interested in buying kilogram amounts of heroin if the CS could get them at a good price. The CS said that it would call GONZALEZ-VINCENTE in a few days. (The CS had previously told GONZALEZ-VINCENTE that it could supply him with heroin from Greece for approximately $40,000 per kilogram).

58. On January 3, 2005, the CS arranged to meet GONZALEZ-VINCENTE and possibly his friend at the Bugaboo Creek restaurant at the North Shore Mall in Peabody to talk about future cocaine and heroin transactions. GONZALEZ-VINCENTE agreed to meet there on January 5, 2005.

23

59.   On January 5th, at approximately 1 p.m., agents met with the CS and provided him with a concealed audio/video recorder.   At approximately 2:30 p.m., the CS called GONZALEZ-VINCENTE and GONZALEZ-VINCENTE informed it that he would be at the restaurant in a few minutes.   At approximately 2:35 p.m., surveillance agents followed the CS to the Bugaboo Restaurant and then observed the CS enter the restaurant.   At approximately 2:43 p.m., surveillance saw GONZALEZ-VINCENTE enter the restaurant and, moments later, meet with the CS.

60.   At approximately 3:10 p.m., surveillance observed a Hispanic male (who introduced himself to the CS as "Richard") enter the restaurant and meet with the CS and GONZALEZ-VINCENTE.   During this meeting, GONZALEZ-VINCENTE said that he would give a kilogram of cocaine base to the CS without payment and then the CS could pay him later in the day.   The CS informed him that it needed the kilogram on January 19, 2005. During the course of their conversation, GONZALEZ-VINCENTE said that he brought workers from the Dominican Republic to the United States to help him with his drug organization.[4]   During

---

[4]During the course of this meeting, GONZALEZ-VINCENTE asked to use the CS's cellular telephone to call "Jonathan" (a/k/a RAMOS). GONZALEZ-VINCENTE mentioned to the CS that Jonathan was at the food court in the mall next door. While the three men were meeting inside, a surveillance agent in the parking lot saw Jonathan walking through the lot to the vicinity of the food court. There, the agent observed Jonathan approach a vehicle and reach inside it from the passenger side (in what the agent believed was a retrieval of drug money or

the course of their meeting, Richard said that his brother lives in New York City and sells approximately three kilograms of heroin per month.   The CS told Richard that it wanted $40,000 per kilogram of heroin.   Richard replied that he was only willing to pay $35,000 per kilogram, but they agreed to negotiate at a later date.   At approximately 3:30 p.m., surveillance observed the three exit the restaurant.   This meeting was monitored and recorded.

61.   Surveillance observed GONZALEZ-VINCENTE enter a white 1998 Kia Sportage, MA registration 6908LS, registered to Francia A. Vicente, 15 Leach Street, Apt. 1L, Salem, MA and Richard enter a gray 1993 Oldsmobile Ciera, MA Registration 70PM12, registered to Wendy V. Santos, 5 Ropes Street, 1st Floor, Salem, MA and then both vehicles departed the area.

62.   On January 13, 2005, the CS met with GONZALEZ-VINCENTE and Richard again at the Bugaboo Creek restaurant at the North Shore Mall in Peabody, MA.   GONZALEZ-VINCENTE called the CS at about noon and told it that he would be about an hour late to the previously scheduled 1 p.m. meeting because he had to make a delivery.   At approximately 2:25 p.m., GONZALEZ-VINCENTE called the CS again to say that he was en route to the

---

delivery of drugs).

25

North Shore mall in a taxi.  When GONZALEZ-VINCENTE arrived at

approximately 2:40 p.m., the CS spoke to him in the parking lot

and GONZALEZ-VINCENTE wanted the CS to go with him to another

restaurant in the mall to meet Richard.  The CS convinced him

to stay at the Bugaboo Creek restaurant and they walked into

the restaurant.  As they walked into the restaurant, GONZALEZ-

VINCENTE called Richard on the CS's cellular telephone to have

him meet them there.  At approximately 2:58 p.m., surveillance

agents observed a male later identified as Richard arrive and

enter restaurant and meet with the CS and GONZALEZ-VINCENTE.

        63.   Before Richard arrived, the CS and GONZALEZ-VINCENTE

discussed the arrangements for the CS's sale of a kilogram of

heroin to Richard.   During the course of this part of their

conversation (and after Richard had arrived), GONZALEZ-VINCENTE

told the CS that if things did not work out with its sale of

the heroin to Richard, he would purchase the kilogram of heroin

because GONZALEZ-VINCENTE had the ability to distribute it.

During the course of this meeting, the CS and GONZALEZ-VINCENTE

also discussed the arrangements for GONZALEZ-VINCENTE to sell a

kilogram of cocaine base to the CS.   They discussed where the

transaction would take place and then GONZALEZ-VINCENTE told it

that he wanted the CS to call him Monday (January 17th) or

Tuesday (January 18th) to confirm the deal for Wednesday (January 19th).

64. On both January 17 and 18, 2005, the CS and GONZALEZ-VINCENTE spoke by telephone to confirm the deal for Wednesday, January 19, 2005. They have agreed to meet at the Bugaboo Creek restaurant at the North Shore Mall in Peabody, MA.

65. On January 19, 2005, surveillance was established at the Target Location. Surveillance agents observed RAMOS exit the Target Location and drive away in the direction of the North Shore mall and surveillance followed the vehicle. Surveillance lost sight of RAMOS's vehicle in traffic about five minutes away from the North Shore mall, but surveillance at the mall picked up sight of RAMOS arriving in the parking lot of the Bugaboo Creek restaurant at the mall shortly thereafter.

66. There, RAMOS met with the CS and told it to call GONZALEZ-VINCENTE. The CS called GONZALEZ-VINCENTE and GONZALEZ-VINCENTE told him that he did not want to do the deal at the restaurant and that he wanted to meet at his uncle's house in Peabody. There were a number of subsequent calls between the CS and GONZALEZ-VINCENTE while the CS was with RAMOS at the restaurant. During the course of one of these conversations, the CS informed GONZALEZ-VINCENTE that the UC

27

would be accompanying the CS to the location for their meet. After these calls, RAMOS indicated to the CS that he would lead him to the location where it would meet GONZALEZ-VINCENTE. Neither GONZALEZ-VINCENTE nor RAMOS specifically identified the location for the CS, but RAMOS got into the CS's vehicle and directed him toward Peabody. The UC who had been waiting in the parking lot followed them in a separate vehicle. (Given the direction that they were proceeding in, it is possible that they were headed toward Spring Street in Peabody. After the September 16, 2003 transaction, GONZALEZ-VINCENTE had the CS drop him on Spring Street. At that time, surveillance agents did not see where on Spring Street he went, but know that one of the telephones that GONZALEZ-VINCENTE has frequent contact with is subscribed to an individual listing the address of 7 Spring Street Court, Peabody, MA).

67. While en route to the undisclosed location, RAMOS instructed the CS to pull over across of Spring Street. The UC, following in his vehicle, also pulled over. At this point, RAMOS told the CS that he did not want to take him to the location until he had spoken to GONZALEZ-VINCENTE. RAMOS then called GONZALEZ-VINCENTE. After this conversation, GONZALEZ-VINCENTE then called the CS and informed it that he did not want the CS to bring the UC along and wanted the CS to come by

28

itself. While the CS was on the telephone with GONZALEZ-VINCENTE, surveillance agents observed RAMOS walk away from the CS's car and begin walking up and down side streets. Although surveillance lost sight of RAMOS for a brief time, they believe that he was engaged in attempts to detect whether there was surveillance watching him.

68. GONZALEZ-VINCENTE, who at the time was still on the telephone with the CS, agreed to meet the CS alone at Big Fred's Restaurant in Salem, MA and they ended the phone call. The CS started to drive in the direction of the restaurant. GONZALEZ-VINCENTE called back and said that he could not reach RAMOS by telephone and asked the CS to locate him. THE CS headed back to the area where RAMOS had walked away from the CS's vehicle and observed RAMOS walking up a street. The CS then called GONZALEZ-VINCENTE again and gave its cellular telephone to RAMOS to talk to GONZALEZ-VINCENTE because RAMOS was having difficulty with his telephone. RAMOS then spoke to GONZALEZ-VINCENTE on telephone. RAMOS then informed the CS that GONZALEZ-VINCENTE wanted to meet it at the food court at the North Shore mall in Peabody, MA. After delivering this message to the CS, RAMOS again walked away from the CS's vehicle. The CS alone then began to drive toward the mall. Enroute to the mall, the CS received another telephone call

29

from GONZALEZ-VINCENTE.  GONZALEZ-VINCENTE told him that he was
concerned that something was not right about the CS's request
to bring the UC along on deal and that he did not want to front
the drugs to the CS, but wanted to see the CS's money first.
In later conversations that day, the CS and GONZALEZ-VINCENTE
agreed to meet the following day (January 20, 2005) for the CS
to show GONZALEZ-VINCENTE the money to pay for the kilogram of
cocaine base.

## V. PROBABLE CAUSE FOR SEARCH WARRANT FOR THE TARGET LOCATION

69.  I have participated in the execution of numerous
search warrants at the residences of drug-traffickers such as
the targets of this investigation.  In a substantial number of
residential searches executed in connection with the drug
investigations in which I have been involved, the following
kinds of drug-related evidence have typically been recovered:

a.   controlled substances;

b.   paraphernalia for packaging, processing, diluting,
weighing, and distributing controlled substances,
such as scales, funnels, sifters, grinders, glass
panes and mirrors, razor blades, plastic bags, and
heat-sealing devices;

c.   books, records, receipts, notes, ledgers, and other
papers relating to the distribution of controlled
substances and personal books and papers reflecting
names, addresses, telephone numbers, and other
contact or identification data relating to drug
customers, drug suppliers, drug associates or

otherwise related to the distribution of controlled substances;

d.    cash, currency, and records relating to income and expenditures, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, and safety deposit keys, from the distribution of controlled substances; and

e.    Cellular telephones, pagers and other devices to communicate with drug customers and/or associates;

70.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person or persons in residence, occupancy, control, or ownership of the subject premises.    Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

71.    Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics and money laundering investigations, I know that narcotics traffickers find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system and that, as a

31

result, narcotics traffickers frequently maintain large amounts of cash and other valuable assets in order to maintain and finance their ongoing business.

72. Also based upon my training and experience, I know that narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, money orders and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business or stash controlled substances and/or drug proceeds. It is common for narcotics traffickers to hide controlled substances, contraband, proceeds of drug sales, records of drug transactions, caches of drugs, financial instruments, keys for safe deposit boxes, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences for ready access and to conceal them from law enforcement authorities. Moreover, when narcotics traffickers amass proceeds from the sale of controlled substances, they

commonly attempt to legitimize those profits. Narcotics traffickers use various means for these purposes, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

73. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

74. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales and packaging materials.

75. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth above, I believe that GONZALEZ-VINCENTE has used his residence at the Target Location in furtherance of his drug trafficking activities, and that evidence regarding those activities, including, but not limited

to the items listed in **Attachment B** attached hereto and incorporated herein including but not limited to cocaine base, cocaine, cash, paraphernalia for the packaging, processing and distribution of controlled substances, cellular telephones, books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, documents reflecting occupancy, dominion and/or control of the Target Location and documents or tangible evidence reflecting dominion, ownership, and/or control by GONZALEZ-VINCENTE over any bank accounts, safe deposit boxes, stocks, bonds, and any other financial and/or monetary assets will be found at the Target Location.

76. As discussed above, GONZALEZ-VINCENTE resides at the Target Location.[5] His September 2, 2003 sale of cocaine base

---

[5]In addition to the statements that GONZALEZ-VINCENTE made to the CS on September 2, 2003 about the Target Location being his place and the subsequent observations of GONZALEZ-VINCENTE at this location, there were also several occasions within the last year in which GONZALEZ-VINCENTE has been observed at the Target Location and presented himself as a resident of this location. On March 27, 2004, the Salem Police Department received a 911 hang-up call from the telephone at the Target Location. As is the normal practice, a Salem Police officer reported to the Target Location. There, the officer encountered GONZALEZ-VINCENTE (who identified himself by name and provided his date of birth as December 20, 1971) and Judith Pinsonnauty. They reported that the 911 call had been made by accident. On August 11, 2004, the Salem Police Department received another 911 hang-up call from the

34

to the CS occurred inside the Target Location. Since that time, the gray Camry (that was used by GONZALEZ-VINCENTE's runners – RAMOS on February 12, 2004, Roberto on August 12, 2004, Tito on September 22, 2004 – to deliver drugs to the CS or by GONZALEZ-VINCENTE himself to deliver drugs to the CS and UC (along with RAMOS) on October 28, 2004), has been observed by surveillance parked behind the Target Location on two occasions (on October 27 and October 28, 2004). In fact, prior to the October 28th transaction in which GONZALEZ-VINCENTE and RAMOS delivered cocaine base to the CS and UC in the gray Camry, the gray Camry had been observed at the Target Location that morning. For the November 17th sale of cocaine base to the UC, GONZALEZ-VINCENTE (and Tiffany) were observed leaving the Target Location and traveling straight to the meeting location with the UC where GONZALEZ-VINCENTE delivered the drugs. At least one of GONZALEZ-VINCENTE's runners, RAMOS, lists the Target Location as his mailing address (with the Massachusetts RMV) and was recently seen by surveillance leaving the Target Location on January 17, 2005.

---

Target Location. On this occasion, a different Salem Police officer reported to the Target Location and spoke with GONZALEZ-VINCENTE who identified himself and provided the same date of birth. He reported that the call had been an accident. On January 3, 2005, the Salem Police Department reported to the Target Location because there had been an incident involving a loose pitbull. On this occasion, GONZALEZ-VINCENTE told the officer that he was caring for a dog owned by Edgar Pimental.

77.   Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises at the Target Location as more fully described in **Attachment A** that is attached hereto and incorporated herein presently contain the items set forth in **Attachment B** that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §§846, 841(a)(1).

## VI. CONCLUSION

78.   Based on all the foregoing, I submit there is probable cause to believe **RAFAEL GONZALEZ-VINCENTE and JOSE A. RAMOS** have conspired to possess with intent to distribute and to distribute a mixture or substance containing a detectable amount of cocaine base, a Schedule II controlled substance, and cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§846, 841(a)(1) and that evidence of the commission of this criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or

intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §§846, 841(a)(1) will be found at the Target Location.

Dated this ___ day of January, 2005.


Matthew M. Deignan
Special Agent, United States
Drug Enforcement Administration


Sworn to and subscribed to before me in Boston, Massachusetts, this 26 day of January, 2005.

CHARLES B. SWARTWOOD, III
CHIEF UNITED STATES MAGISTRATE JUDGE

**Attachment A**

The premises to be searched at 14 Cherry Street, Apartment 1, Salem, MA are described as followed:

12-14 Cherry Street Salem, MA is a three story wooden structure with cream colored siding and blue trim. The front of the building faces Cherry Street. The front porch is painted brown. On the second floor of the front of the building there is a porch which also has two separate white storm doors. There are two separate brown wooden front doors. Each door has blue trim around the doorway and each door has six panes of glass in them. There are no house numbers visible on either door. 14 Cherry Street is accessed by the door on the left hand side. Apartment One of 14 Cherry Street is located on the first floor. Inside the front door there is a small foyer and a second door. There is a driveway to the left of the building that leads to a common parking area at the rear of the building. At the back of the building there are two separate entrances; each one has a brown door. The right rear entrance is the back entrance to 14 Cherry Street. (A photograph is attached).



## Attachment B

The items to be seized at 14 Cherry Street, Apartment 1, Salem, MA are described as follows:

1. Cocaine base and cocaine.

2. Paraphernalia for the packaging, processing and distribution of controlled substances such as cocaine and cocaine base, including but not limited to, packaging materials and scales.

3. Cellular telephones and other communication devices used to communicate with drug customers, drug suppliers and drug associates.

4. Books, records, notes, ledgers, and any other papers or records relating to the purchase, transportation, shipment, ordering, sale, importation, manufacture, and/or distribution of controlled substances and/or records relating to the receipt, disposition, and/or laundering of proceeds from the distribution of controlled substances, such as cocaine base or cocaine, and/or records or electronic devices reflecting the identity of co-conspirators and drug customers, as well as their addresses, telephone numbers and/or pager numbers. Such documents include but are not limited to, telephone address books, planners, receipts, state and federal income tax returns and supporting paperwork, note, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, meal receipts, credit card receipts, hotel receipts, meal receipts, travel agency vouchers, travel schedules, shipment records, telephone bills and/or toll records and bills.

5. Cash and currency and other items of value made or derived from trafficking in illegal substances or documents related thereto including but not limited to titles and deeds to real property, monetary notes, registrations, purchase and sale invoices, bank records or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing or expending money or other items of value made or derived from trafficking in controlled substances.

6. Documents reflecting occupancy, dominion and/or control of 14 Cherry Street, Apt. 1, Salem, MA including but not limited to canceled mail, deeds, leases, rental agreements, utility and telephone bills and statements, photographs, keys, identification cards and documents, checks and/or check registers.

7. Documents or tangible evidence reflecting dominion, ownership, and/or control by Rafael Gonzalez-Vincente, over any bank accounts, safe deposit boxes, stocks, bonds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property and commercial storage facilities.